672 So.2d 1319 (1994)
Willie C. DOBYNE
v.
STATE.
CR-91-1840.
Court of Criminal Appeals of Alabama.
April 15, 1994.
*1324 Philip Lisenby, Centreville, and Sharon D. Hindman, Russellville, for appellant.
James H. Evans, Atty. Gen., and Melissa Math and Frances Smith, Asst. Attys. Gen., for appellee.
TAYLOR, Judge.
The appellant, Willie C. Dobyne, was convicted of murder made capital because the murders occurred during the course of a robbery in the first degree. See ง 13A-5-40(a)(2), Code of Alabama 1975. The jury, by a vote of 10 to 2, recommended that the appellant be sentenced to death. The trial court accepted the jury's recommendation and sentenced the appellant to death by electrocution.
The state's evidence tended to show that on January 12, 1991, at approximately 2:30 a.m., Leon Billingsley and Linda Snipes, employees of the County Truck Stop and Sawmill Restaurant (hereinafter called the County Truck Stop) in Brent, Alabama, were shot by the appellant and his codefendant, Cleophus Dukes. Evidence showed that the appellant shot Billingsley in the back and that Dukes shot Snipes in the upper chest and neck. Kenneth E. Warner, State Medical Examiner, testified that both victims died as a result of the injuries.
After the shootings the appellant and Dukes took Snipes's purse and the cash register and went to Bear Creek. They then forced open the register, which contained approximately $200.00 in cash, and threw the empty register in the water. Dukes later disposed of the guns by throwing them in Haysop Creek.
Because there were no eyewitnesses to the events, the above information was elicited from a tape-recorded conversation between the appellant and his half-brother, Joshua Suttle, and from a statement that the appellant gave to police. Other evidence was presented that connected the appellant to the crime and the shotguns were retrieved from Haysop Creek.
Anthony Parks testified that earlier on the night the shootings occurred, he was with the appellant and Dukes at a trailer belonging to Dukes's brother. He said that both Dobyne and Dukes were in the trailer when he went to bed. Parks stated that when he went to bed there were two shotguns in his bedroom, and that when he awoke the next morning the shotguns were gone and so were the appellant and Dukes. Parks identified one of the guns discovered in Haysop Creek as the gun that belonged to his father and that was in the bedroom when he went to bed. The other gun discovered in the creek, Parks testified, was like the other gun in the trailer the night before the shootings.
Bob Rinehart, chief of police of Brent, testified that he was at the County Truck Stop at approximately 11:00 p.m. on the night the murders occurred. He testified that at that time the appellant and Dukes were at the County Truck Stop. He further stated that he purchased two drinks and that Snipes put the money he paid her for the drinks in the cash register.
The manager of the County Truck Stop, Earnie Wilson, testified that when he left at around 10:00 p.m. on the night of the murders, both Billingsley and Snipes were in the store and there was approximately $200 in the cash register.
We note that many of the issues raised by the appellant on appeal deal with matters not objected to at trial or otherwise preserved for appellate review. "While this will not bar our review in a case involving the death penalty, it will weigh against any claim of prejudice." Williams v. State, 601 So.2d 1062, 1066 (Ala.Cr.App.1991). Rule 45A, A.R.App.P. states:
"In all cases in which the death penalty has been imposed, the court of criminal appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely *1325 affected the substantial right of the appellant."
As we recognized in Burton v. State, 651 So.2d 641 (Ala.Cr.App.1993): "`[T]he plainerror exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result."` United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1, 12 (1985), quoting United States v. Frady, 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982)." Burton, 651 So.2d at 645.

I
The appellant initially contends that the first count of the indictment against him was duplicitous in violation of Rule 13.3, A.R.Crim.P., which states, "Two or more offenses shall not be joined in the same count." Specifically, he argues that he was charged with two counts of robbery-murder in one count of the indictment. Count I of the indictment against the appellant reads as follows:
"The Grand Jury of said County charge that before the finding of this indictment Willie C. Dobyne whose name is otherwise unknown to the Grand Jury other than as stated, did intentionally cause the death of another person, to-wit: Linda Snipes and Leon Billingsley by shooting them with a shotgun, and Willie C. Dobyne caused said death during the time that he was in the course of committing a theft of United States Currency, the Property of County Truck Stop, by the use of force against the persons of Linda Snipes and Leon Billingsley, with intent to overcome their physical resistance or physical power of resistance, while the said Willie C. Dobyne was armed with a deadly weapon or dangerous instrument, to-wit: a shotgun, in violation of Section 13A-5-40(a)(2) of the Code of Alabama, against the peace and dignity of the State of Alabama."
Initially, we observe that this issue was not presented to the trial court. Rule 15.2(a), A.R.Crim.P., states: "Objections based on defects in the commencement of the proceeding or in the charge, other than lack of subject matter jurisdiction or failure to charge an offense, may be raised only by pretrial motion as provided in Rule 15.3." "Duplicity does not rise to the level of a failure to charge an offense." Campbell v. State, 508 So.2d 1186, 1191 (Ala.Cr.App. 1986). Thus, this issue should have been raised before trial. Rule 15.2, A.R.Crim.P. Because this issue was not timely raised, we must evaluate this contention under the plain error doctrine. Rule 45A, A.R.App.P.
Rule 13.3[1] states: "Two or more offenses shall not be joined in the same count." It was a violation of this rule to join both capital murders, ง 13A-5-40(a)(2), in the same count of the indictment. However, this error was error without injury to the appellant. The appellant could lawfully have been indicted for two counts of capital murder, the murder of Billingsley during a robbery and the murder of Snipes during a robbery. The appellant faced conviction for two counts of capital murder. He has not suffered any prejudice. Committing a double murder is also a capital offense under ง 13A-5-40(a)(10). This was the offense charged in count II of the indictment. This count was dropped before the case was submitted to the jury.
Although we will not attempt to foresee all ramifications of this issue that might be presented by future cases, we hold that the error in the indictment in this case was error without injury under Rule 45, A.R.App.P. This rule states:
"No judgment may be reversed or set aside, nor new trial granted in any civil or criminal case on the ground of misdirection of the jury, the giving or refusal of special charges or the improper admission or rejection of evidence, nor for error as to any matter of pleading or procedure, unless in the opinion of the court to which the appeal is taken or application is made, after an examination of the entire cause, it should appear that the error complained of *1326 has probably injuriously affected substantial rights of the parties."
The defect in the indictment was not called to the attention of the trial court. Therefore, the limitation upon finding plain error must be applied in this case. Rule 45A, A.R.App.P.
The appellant further contends that the indictment was fatally defective because, he says, it failed to allege that the items stolen were the property of the victims. Again, this issue was not brought to the attention of the trial court; thus the plain error doctrine applies.
As the Alabama Supreme Court stated in Ex parte Hamm, 564 So.2d 469, 471 (Ala.), cert. denied, 498 U.S. 1008, 111 S.Ct. 572, 112 L.Ed.2d 579 (1990):
"[T]he statutes that define the elements of first degree robbery do not require that the person against whom force is used be the owner of the stolen property. Ala. Code 1975, งง 13A-8-41(a) and -43(a); Raines v. State, 429 So.2d 1104, 1106 (Ala. Cr.App.), aff'd, 429 So.2d 1111 (Ala.1982), cert. denied, 460 U.S. 1103, 103 S.Ct. 1804, 76 L.Ed.2d 368 (1983)."
The indictment was not defective for stating that the owner of the stolen property was the truck stop rather than the murdered employees. Rheaume v. State, 624 So.2d 678 (Ala.Cr.App.1993).

II
The appellant next contends that the trial court erred in not holding a competency hearing. This issue was never presented to the trial court; therefore, our consideration of it can only be through application of the plain error rule.
The record reflects that the appellant initially pleaded not guilty by reason of mental disease or defect.[2] Upon motion of the appellant the court ordered that he be examined at Taylor Hardin Secure Medical Facility. Dr. Kathy A. Rogers, a certified forensic examiner at Taylor Hardin, evaluated the appellant and found him competent to stand trial.
Based on Dr. Rogers's findings, the trial court determined that no competency hearing was necessary. The court is the initial screening agent for requests for mental examinations, Reese v. State, 549 So.2d 148 (Ala.Cr.App.1989), overruled on other grounds, Huntley v. State, 627 So.2d 1013 (Ala.1992), and the system relies on the sound judgment of the trial judge. There was no error in not ordering a competency hearing. ง 15-16-22, Code of Alabama 1975; Rule 11.3, A.R.Crim.P.

III
The appellant next contends, in his third brief to this court, that his equal protection rights were violated because, he says, blacks have been systematically excluded from the position of foreperson of grand juries in Bibb County.
After the brief raising this issue was filed with this court, the appellant filed his third amended motion to supplement the record on appeal, under Rule 10(g), A.R.App.P., with an affidavit prepared by the circuit court clerk for Bibb County. This affidavit was not prepared until more than one year after the notice of appeal in this case had been filed. The appellant was attempting to supplement the record with evidence that was never before the trial court. The trial court, in denying this third amended motion to supplement the record, stated:
"This issue was not raised before the trial court and for the first time appears in this the Defendant's third amended motion to supplement the record on appeal."
Rule 10(g) was not meant to apply to situations where the evidence sought to be brought to the appellate court's attention was never received by or offered to the trial court. Rule 10(g) applies to, "admitted or offered evidence that is material to any issue." As this court said in Allen v. State, 598 So.2d 1031, 1034 (Ala.Cr.App.1992):
"The appellant sought to supplement the record on appeal by including matter that was not introduced at the appellant's trial. Rule 10(f) [now 10(g)], A.R.App.P., governs *1327 the omission of material that was actually a part of the record below. Richburg v. Cromwell, 428 So.2d 621 (Ala.1983); Williams v. City of Northport, 557 So.2d 1272 (Ala.Civ.App.1989), cert. denied, 498 U.S. 822, 111 S.Ct. 71, 112 L.Ed.2d 45 (U.S.Ala.1990); Thomas v. State, 550 So.2d 1057 (Ala.Crim.App.1989), aff'd, State v. Thomas, 550 So.2d 1067 (Ala.1989). In its denial of the motion, the trial court clearly stated that the matter the appellant sought to have included had never been before the trial court. Thus, the evidence could not have been properly added to the record on appeal."
This affidavit was not admitted or offered into evidence at the circuit court level. Thus, the court did not err in denying the appellant's motion to supplement the record with the circuit court clerk's affidavit.
This court is bound by the certified record on appeal. The certified record provides no foundation for considering this issue. In order to prevail on a claim of discriminatory practice in the selection of forepersons of grand juries, the accused must establish a prima facie case of discrimination. Locke v. State, 631 So.2d 1062 (Ala.Cr.App.1993); Lee v. State, 631 So.2d 1059 (Ala.Cr.App.1993).
In many cases the appellate courts in this state have refused to find plain error grounded on Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), when no prima facie showing of discrimination appears on the face of the record. Ex parte Watkins, 509 So.2d 1074 (Ala.1987), cert. denied, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987); Jenkins v. State, 627 So.2d 1034 (Ala.Cr.App.1992), aff'd, 627 So.2d 1054 (Ala. 1993); Kuenzel v. State, 577 So.2d 474, 489 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).

IV
The appellant next contends that the circuit clerk's office of Bibb County incorrectly excused prospective jurors over the telephone and outside of his presence.
The validity of the circuit clerk's excusing prospective jurors by telephone was recently addressed by the Alabama Supreme Court in Windsor v. State, [Ms. 1930048, February 18, 1994] ___ So.2d ___ (Ala.1994). That court stated:
"[N]othing in the statutes suggests that excusing potential jurors by telephone is in any way improper, at least if done by a person properly designated and authorized to excuse. See, งง 12-16-63 and XX-XX-XXX."
___ So.2d at ___.
The circuit clerk of Bibb County testified that he was authorized by the presiding judge of the County to excuse prospective jurors. The clerk for Bibb County could not testify as to the precise reasons for each excusal of a prospective juror. It appears from the record that out of 150 jurors who were called for service, 28 were excused on the basis that they suffered from some kind of disability, and 15 others were excused without reasons being stated therefor. As the Alabama Supreme Court further stated in Windsor:
"This [suggestion of impropriety in excusing jurors] is nothing like the proof of fraud required by ง 12-16-80 Ala.Code 1975, even though the word `fraud,' as used in the statute, is `a relative term which "includes all acts and omissions which involve a breach of legal duty injurious to others"` and even though `a legal fraud is all that is required by the statute for a venire to be quashed.' Kittle v. State, 362 So.2d 1271, 1273 (Ala.1978) (citation omitted). `There is a presumption that no legal fraud exists in the system used for the selection of jurors, in the absence of proof to the contrary, or an offer of such proof.' Nixon v. State, 291 Ala. 657, 286 So.2d 315, 317 (1973)."
Windsor, ___ So.2d at ___. Based on Windsor, we hold that no error occurred when the clerk excused the jurors from service by telephone.
The appellant also argues that it was error for the clerk to excuse these prospective jurors outside his presence. Section 12-16-74, Code of Alabama 1975, specifically states that the appellant does not have to be present when potential jurors are excused: "The *1328 court may in any case, including capital cases, excuse ... any prospective juror outside the presence of the parties and their counsel...." See Ex parte Pierce, 612 So.2d 516 (Ala.1992), cert. denied, ___ U.S. ___, 114 S.Ct. 201, 126 L.Ed.2d 158 (1993).

V
The appellant next contends that the jury pool failed to represent disabled persons and black persons in Bibb County. The appellant specifically contends that his right under the Equal Protection Clause of the United States Constitution to a venire representing a fair cross-section of the community was violated because, he says, these two groups have been systematically excluded from jury service in Bibb County.
"The Sixth Amendment requires that petit juries `be drawn from a source fairly representative of the community.' Taylor v. Louisiana, 419 U.S. 522, 538, 95 S.Ct. 692, 702, 42 L.Ed.2d 690 (1975). When raising a claim under this requirement, a defendant `has the burden of establishing a prima facie case of a "fair cross section" violation. Rayburn v. State, 495 So.2d 733 (Ala.Crim.App.1986).' Pierce v. State, 576 So.2d 236, 241 (Ala.Cr.App.1990), cert. denied, 576 So.2d 258 (Ala.1991)."
Sistrunk v. State, 630 So.2d 147, 149 (Ala.Cr. App.1993).
The Supreme Court of the United States in Duren v. Missouri, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), established a three-pronged test that must be met before an individual can establish a violation of the "fair-cross-section" requirement. The individual alleging a violation must prove:
"(1) that the group alleged to be excluded is a `distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process."
439 U.S. at 364, 99 S.Ct. at 668, 58 L.Ed.2d at 587.
Testimony established that the method of selecting prospective jurors in Bibb County was by randomly picking names from driver's license lists. "This method of jury venire selection has been ratified by this court in Vaughn v. State, 485 So.2d 388 (Ala.Cr.App. 1986)." Jackson v. State, 560 So.2d 1100, 1102 (Ala.Cr.App.1989).
The record also reflects that at the hearing on this motion the appellant presented the testimony of Dr. Donald Bogie, a professor of sociology at Auburn University and director of the center for demographics and cultural research. Dr. Bogie testified that according to the 1980 census, disabled persons age 16 and over made up approximately 5.1% of the total population of Bibb County. He further testified that the census classified the disabled as those with transportation disabilities and those with work disabilities. Dr. Bogie stated the following:
"Q [defense counsel]โAnd would that be generally consistent with your opinion as to the population of people with transportation disabilities in Bibb County in 1990?
"AโIt's difficult to say, because the numbers are going to change a little bit. But there tends to be a certain amount of disability, I think, as far as this particular piece of data is concerned. I would anticipate it would not be substantially difficult."
Dr. Bogie's statistics were based on figures over 10 years old. Furthermore, he stated that the 5.1% figure in the 1980 census included individuals age 16 and over. To be a qualified juror in Alabama, an individual must be over the age of 19. ง 12-16-60(a)(1), Code of Alabama 1975. Therefore, Dr. Bogie's figures are of little use in determining the number of disabled persons eligible to serve on juries in Bibb County. The appellant did not establish a violation of the fair cross-section requirement as to the disabled under Duren.
The appellant also contends that blacks were discriminated against in the selection of the venire and that the percentage of blacks on the venire did not mirror that of the community. As Judge Bowen stated in Sistrunk:
"It is true that the particular panel from which the appellant's jury was struck contained *1329 a substantially smaller percentage of blacks than does the population of Dale County. However, the fair cross-section requirement `ensures only a venire of randomness, one free of systematic exclusion. It does not ensure any particular venire.' Note, United States v. Gelb: The Second Circuit's Disappointing Treatment of the Fair Cross-Section Guarantee, 57 Brook. L.Rev. 341, 343 n. 7 (1991). `Rather than being entitled to a cross-sectional venire,' a defendant `has a right only to a fair chance, based on a random draw, of having a jury drawn from a representative panel.' Comment, The Cross-Section Requirement and Jury Impartiality, 73 Cal.L.Rev. 1555, 1565 (1985). See Johnson v. State, 502 So.2d 877, 880 (Ala.Cr.App.1987) (venire need not be `"a perfect mirror of the community or accurately reflect the proportionate strength of every identifiable group."')."
". . . .
"`In the absence of a showing of systematic exclusion, the showing of a disparity between the percentage of blacks in the population of the county in which venue is situated and the percentage of blacks on the venire does not establish a violation of the fair cross-section requirement.' Stewart v. State, 623 So.2d 413 (Ala.Cr.App. 1993)."
Sistrunk, 630 So.2d at 150.

VI
The appellant next asserts that his due process rights were violated when a pretrial hearing was held in his absence. The record shows that a hearing was held, without the appellant being present, on the appellant's motion challenging the composition of the venire. the appellant's attorney attended the hearing, and presented two witnesses; the state presented no witnesses. The following occurred during the hearing:
"The Court: Just a second. Your defendant is not present.
"Mr. Owings [defense counsel]: That's true, your Honor. We're waiving his presence. Is there difficulty with this?
"The Court: Well, you normally should not have anything done without your defendant being present in a capital case.
"Mr. Owings: I'm waiving it. If the Judge is concerned about itโ
"The Court: Can you waive his presence in a capital case?
"Mr. Owings: I don't know. Roy [prosecutor], can you?
"(Whereupon an off-the-record discussion was had between counsel and the Court.)
"Mr. Owings: We waive his presence."
The appellant did not present this issue to the trial court. We can consider the question only under the plain error doctrine.
As Judge Patterson stated in McMillian v. State, 594 So.2d 1253, 1270 (Ala.Cr.App. 1991), remanded, 594 So.2d 1288 (Ala.), on return to remand, 594 So.2d 1289 (Ala.Cr. App.1992), a defendant "[i]s prohibited from waiving his right to be present when he is charged with the violation of an offense punishable by death."
"The Confrontation Clause of the Sixth Amendment guarantees a defendant the right to be present at any stage of the trial when his presence would contribute to his opportunity for effective cross-examination. Kentucky v. Stincer, 482 U.S. 730, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987). Because of the nature of the hearing at issue in this case, we conclude that the appellant's confrontation rights were not violated by his absence from the proceedings. The proceedings were such that the right of confrontation and cross-examination did not arise because there were no witnesses or evidence to confront.
"The Due Process Clause of the Fifth Amendment grants a defendant the right to be present at any stage of a criminal proceeding that is `critical to its outcome if his presence would contribute to the fairness of the procedure.' Id. at 745, 107 S.Ct. at 2667. Again, because of the nature of the proceedings, we conclude that the appellant's due process rights were not violated because of his absence. The appellant has advanced nothing to show that his presence at the hearing would have been useful or that a fair hearing was *1330 thwarted by his absence. His presence was not required to ensure fundamental fairness or a reasonably substantial opportunity to defend against the charge. See Kentucky v. Stincer, Snyder v. Massachusetts, 291 U.S. 97, 54 S.Ct. 330, 78 L.Ed. 674 (1934); Newsome v. State, 570 So.2d 703 (Ala.Cr.App.1989), cert. quashed, 570 So.2d 703 (Ala.1990)."
McMillian, 594 So.2d at 1270. For capital cases where this court has held the defendant's absence from a hearing to be harmless, see Burton, supra; Jackson v. State, [Ms. CR-91-820, September 30, 1993] ___ So.2d ___ (Ala.Cr.App.1993); DeBruce v. State, 651 So.2d 599 (Ala.Cr.App.1993); Harris v. State, 632 So.2d 503 (Ala.Cr.App.1992), aff'd, 632 So.2d 543 (Ala.1993). Cf. McGahee v. State, 632 So.2d 976 (Ala.Cr.App.), aff'd, 632 So.2d 981 (Ala.1993).
We hold as this court did in McMillian that the appellant's absence from the hearing did not violate his constitutional rights. The state presented no witnesses at the hearing. The appellant has not shown how he was prejudiced by his absence from the pretrial motion hearing.

VII
The appellant next contends that the trial court erred in denying his motion for a change of venue. He contends that a large portion of the venire was exposed to prejudicial pretrial publicity concerning the case, therefore, he says, he was denied an impartial jury.
The appellant presented no evidence except that elicited through voir dire examination. The record reflects that several veniremembers said that they had heard about the case. But the record also shows that all but one of those veniremembers stated that they could decide the case based solely on the evidence presented. The one veniremember who said that the pretrial publicity might affect his decision was excused for cause by the court.
As this court stated in Hunt v. State, 642 So.2d 999, 1042 (Ala.Cr.App.1993):
"`The determination of whether or not to grant a motion for change of venue is generally left to the sound discretion of the trial judge because he has the best opportunity to assess any prejudicial publicity against the defendant and any prejudicial feeling against the defendant in the community which would make it difficult for the defendant to receive a fair and impartial trial.'
"Nelson v. State, 440 So.2d 1130, 1132 (Ala. Cr.App.1983). See also Trahan v. State, 450 So.2d 1102 (Ala.Cr.App.1984)."
The voir dire establishes that the court did not err in denying appellant's motion for a change of venue." "The appropriate method to establish the existence of adverse publicity or actual prejudice is through voir dire examination of potential jurors.'" Hunt, 642 So.2d at 1044, quoting Hart v. State, 612 So.2d 520, 527 (Ala.Cr.App.), aff'd, 612 So.2d 536 (Ala.1992), cert. denied, 508 U.S. 953, 113 S.Ct. 2450, 124 L.Ed.2d 666 (1993).
"`The constitutional standard of fairness requires that a defendant have "a panel of impartial, `indifferent' jurors." Irvin v. Dowd, 366 U.S. [717,] 722, [81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961)]. Qualified jurors need not, however, be totally ignorant of the facts and issues involved.' Murphy v. Florida, 421 U.S. 794, 799-800, 95 S.Ct. 2031, 2035-2036, 44 L.Ed.2d 589 (1975). Such a requirement is unreasonable. Considering the responses of each prospective juror during voir dire examination, we hold that there was no actual prejudice in this case."
Hunt, 642 So.2d at 1045.

GUILT PHASE

VIII
The appellant next asserts that the trial court erred in excusing a prospective juror from service because she stated that she had been arrested in another county several months earlier.
This allegation of error must be evaluated under the plain error doctrine because no objection was made at the time this member of the venire was excused. Rule 45A, A.R.App.P.
The record reflects that this juror was excused when the court initially questioned *1331 the venire to see if they met the juror qualifications set out in ง 12-16-60, Code of Alabama 1975. This section states in part:
"(a) A prospective juror is qualified to serve on a jury if the juror is generally reputed to be honest and intelligent and is esteemed in the community for integrity, good character and sound judgment and also:
"(1) Is a citizen of the United States, has been a resident of the county for more than 12 months and is over the age of 19 years;
"(2) Is able to read, speak, understand and follow instructions given by a judge in the English language;
"(3) Is capable by reason of physical and mental ability to render satisfactory jury service, and is not afflicted with any permanent disease or physical weakness whereby the juror is unfit to discharge the duties of a juror;
"(4) Has not lost the right to vote by conviction for any offense involving moral turpitude."
The United States Supreme Court in Carter v. Jury Commission of Greene County, 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970), stated:
"It has long been accepted that the Constitution does not forbid the States to prescribe relevant qualifications for their jurors. The States remain free to confine the selection to citizens, to persons meeting specified qualifications of age and educational attainment, and to those possessing good intelligence, sound judgment, and fair character. `Our duty to protect the federal constitutional rights of all does not mean we must or should impose on states our conception of the proper source of jury lists, so long as the source reasonably reflects a cross-section of the population suitable in character and intelligence for that civic duty.'"
396 U.S. at 332-33, 90 S.Ct. at 525, 24 L.Ed.2d at 559, quoting in part, Brown v. Allen, 344 U.S. 443, 474, 73 S.Ct. 397, 416, 97 L.Ed. 469 (1953).
The state argues that it was not error to excuse this veniremember because she was not qualified to serve as a juror under ง 12-16-60(a), i.e. because she was not "generally reputed to be honest ... [and] esteemed in the community for integrity, good character and sound judgment...." See also Connell v. State, 56 Ala.App. 43, 318 So.2d 782, rev'd on other grounds, 294 Ala. 477, 318 So.2d 710 (1974).
Although ง 12-16-60 does not specifically state that an individual who has a pending charge is not qualified to serve as a juror, we note that a similar provision is specifically provided for in the United States Code. See 28 U.S.C. ง 1865(b) (1988). This section states:
"[T]he chief judge of the district court ... shall deem any person qualified to serve on grand and petit juries in the district court unless heโ
". . . .
"(5) has a charge pending against him for the commission of, or has been convicted in a State or Federal court of record of, a crime punishable by imprisonment for more than one year and his civil rights have not been restored."
The court's excusing this prospective juror from service based on ง 12-16-60, Code of Alabama 1975, was not error.

IX
The appellant further contends that the trial court erred in failing to excuse for cause several members of the venire after they made certain responses on voir dire. He contends that two prospective jurors admitted that they were exposed to prejudicial pretrial publicity and that that exposure biased their opinion of the case. Another prospective juror, he contends, had gone to school with the victims and admitted to having been exposed to prejudicial pretrial publicity. Another prospective juror, the appellant asserts, had been a client at the firm of one of the part-time district attorneys who was prosecuting the case. The appellant contends that these four prospective jurors should have been excused for cause based on their answers during voir dire.
"`To justify a challenge of a juror for cause there must be a statutory ground *1332 ..., or some matter which imports absolute bias or favor, and leaves nothing to the discretion of the trial court.' Nettles v. State, 435 So.2d 146, 149 (Ala.Cr.App.), affirmed, Ex parte Nettles, 435 So.2d 151 (Ala.1983)."
Minshew v. State, 542 So.2d 307, 309 (Ala.Cr. App.1988).
As the United States Supreme Court stated in Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975):
"`To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.' [Irvin v. Dowd, 366 U.S. 717] at 723, 81 S.Ct. [1639] at 1642, [6 L.Ed.2d 751 (1961)]."
421 U.S. at 800, 95 S.Ct. at 2036, 44 L.Ed.2d at 595.
Each of these four prospective jurors stated that he or she could put aside any prior knowledge or association and try the case on the evidence presented at trial. No evidence was presented to indicate that any of these four prospective jurors had an "absolute bias," which would affect their ability to impartially try the case. The trial court committed no error in failing to strike these prospective jurors for cause.
The appellant further contends that the trial court erred in striking for cause several prospective jurors. The appellant specifically contends that one prospective juror should not have been excused because his relationship to the appellant was never "established." The record reflects that this prospective juror answered during voir dire that he was related to the appellant and that he could not impartially try the case because his relationship with the appellant would affect his verdict. When reviewing the challenges for cause, the court stated that this juror's relationship with the appellant was never specified and the court needed to bring him back for questioning. When this prospective juror was brought back to the courtroom for questioning the juror stated that he did not know his exact relationship to the appellant but he knew that the appellant was "close kin" to him. This is a sufficient reason for the court to strike this prospective juror for cause. Although the prospective juror did not know his "degree of kinship" to the appellant, his answer was sufficient to eliminate him for cause under ง 12-16-150(4), Code of Alabama 1975. Furthermore, this prospective juror stated unequivocally that he could not impartially try the case. This reason was also sufficient to strike the prospective juror for cause.
The next jurors struck for cause were two jurors who stated that they could not impose the death penalty under any circumstances. This is a statutory challenge for cause in a case involving the death penalty. Section 12-16-152, Code of Alabama 1975, provides:
"On the trial for any offense which may be punished capitally or by imprisonment in the penitentiary, it is a good cause of challenge by the state that the person would refuse to impose the death penalty regardless of the evidence produced or has a fixed opinion against penitentiary punishment or thinks that a conviction should not be had on circumstantial evidence, which cause of challenge may be proved by the oath of the person or by other evidence."
(Emphasis added.)

X
The appellant next contends that the circuit court erred in denying his motion based on Batson, supra. In Batson, the United States Supreme Court held that the Equal Protection Clause prohibits the removal of blacks from a black defendant's jury solely on the basis of their race. 476 U.S. at 89, 106 S.Ct. at 1719. In Powers v. Ohio, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), the Court extended its decision in Batson to apply also to white defendants. Batson was further extended to apply to civil cases in Edmonson v. Leesville Concrete Co., 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991). The United States Supreme Court in Georgia v. McCollum, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992), held that the *1333 protections of Batson were also applicable to defense counsel in criminal trials. See also Lemley v. State, 599 So.2d 64 (Ala.Cr.App. 1992). The Alabama Supreme Court, in White Consolidated Industries, Inc. v. American Liberty Insurance Co., 617 So.2d 657 (Ala.1993), further extended the protections of Batson to white veniremembers.
Although the court did not rule that the appellant had made a prima facie showing that the state used its peremptory strikes in a racially discriminatory manner, the court ordered the state to give reasons for its strikes. When the state gives reasons for its strikes, we need not consider whether there was a prima facie case of discrimination. We proceed directly to a review of the state's reasons. Burton, supra.
The appellant contends that the state failed to provide race-neutral reasons for its strikes of two black veniremembers. The state, through assistant district attorney Michael Murphy, gave the following reasons for all of its strikes:
"Judge, the State struck every potential juror who stated they knew the Defendant or his family and that would include jurors M.J. [black veniremember], T.J., W.K. [black veniremember], and A.N. Two of them being black. The State also struck all potential jurors who stated they knew Cleophus Dukes or his family and that includes jurors C.C. [black veniremember], D.C., W.K., and J.W.S. And the State further struck anybody who has been convicted of a DUI, and that included juror G.B., I.F. [struck by defense], M.C.H. [black veniremember], and S.J. [excused]. We intended to strike those jurors. For further reason on M.C.H., I have personally prosecuted him on a DUI case. On C.C., State is familiar with kinsfolk which the State has prosecuted in Perry County and is serving a prison term."
The reasons provided by the state for its strikes have been held in other cases to be race-neutral. Striking a veniremember because he knew the defendant or the defendant's family is a valid race-neutral reason that does not violate Batson. Brown v. State, 623 So.2d 416 (Ala.Cr.App.1993); Williams v. State, 620 So.2d 82 (Ala.Cr.App. 1992). Additionally, the fact that a veniremember or a member of his family had been prosecuted for committing a crime is a valid race-neutral reason for striking a prospective juror. Butler v. State, 646 So.2d 689 (Ala.Cr. App.1993); Bang v. State, 620 So.2d 106 (Ala. Cr.App.1993).
In his brief on appeal, the appellant specifically questions the state's reasons for striking C.C. and M.C.H. We hold that raceneutral reasons were given for all of the prosecution's strikes, including C.C. and M.C.H.

XI
The appellant next contends that the trial court erred in denying his motion to prepare a transcript of the grand jury testimony. The case action summary sheet reflects that a motion was filed to have the grand jury testimony transcribed. However, this motion is not included in the record.
When this motion was discussed in court the following occurred:
"The Court: ... Motion to Prepare Transcript of Grand Jury Testimony. Is there testimony?
"Mr. Johnson [district attorney]: No.
"Mr. Owings [defense counsel]: It's my understanding there's none."
This is the only mention in the transcript of a motion to prepare a transcript of the grand jury testimony. Under these circumstances, no error occurred here. Rule 45A, A.R.App.P.

XII
The appellant next contends that the trial court committed reversible error in allowing photographic slides of the victims' corpses to be shown to the jury. He contends that the slides were gruesome and that their receipt into evidence resulted in prejudice to him. The court did not err in allowing the jury to see the slides of the victim's wounds.
"`Generally, photographs are admissible into evidence in a criminal prosecution "if they tend to prove or disprove *1334 some disputed or material issue, to illustrate or elucidate some other relevant fact or evidence, or to corroborate or disprove some other evidence offered or to be offered, and their admission is within the sound discretion of the trial judge." Magwood v. State, 494 So.2d 124, 141 (Ala.Cr.App.1985), aff'd, 494 So.2d 154 (Ala.1986), cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986). See also Woods v. State, 460 So.2d 291 (Ala.Cr.App.1984); Washington v. State, 415 So.2d 1175 (Ala.Cr.App. 1982); C. Gamble, McElroy's Alabama Evidence, ง 207.01(2) (3d ed. 1977).
"`... The fact that a photograph is gruesome and ghastly is no reason to exclude it from the evidence, so long as the photograph has some relevancy to the proceedings, even if the photograph may tend to inflame the jury.'
"Bankhead v. State, 585 So.2d 97, 109 (Ala. Cr.App.1989), remanded on other grounds, 585 So.2d 112 (Ala.), on remand, 585 So.2d 133 (Ala.Cr.App.1991); Ex parte Siebert, 555 So.2d 780 (Ala.1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990). Lawhorn v. State, 581 So.2d 1159 (Ala.Cr.App.1990), aff'd, 581 So.2d 1179 (Ala.1991), cert. denied, 502 U.S. 970, 112 S.Ct. 445, 116 L.Ed.2d 463 (1991).
"The State has the burden of proving that the victim was dead, and this photograph was direct evidence on that point. Perpetrators of crimes that result in gruesome scenes have reason to expect that photographs of those gruesome scenes will be taken and admitted into evidence."
Jenkins, 627 So.2d at 1044-45.
As this court stated in DeBruce, supra:
"`[P]hotographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors.' Ex parte Siebert, 555 So.2d 780, 784 (Ala.1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990). See generally C. Gamble, McElroy's Alabama Evidence, ง 207.01(2) (4th ed. 1991). `The photographs of the victim were properly admitted into evidence. Photographic exhibits are admissible even though they may be cumulative, ... demonstrative of undisputed facts, ... or gruesome....' Williams v. State, 506 So.2d 368, 371 (Ala.Cr.App. 1986), cert. denied, 506 So.2d 372 (Ala. 1987)."
DeBruce, 651 So.2d at 607. No error occurred here.

XIII
The appellant further contends that the statements he made to police should not have been received into evidence because, he says, the statements were not voluntary. He contends that he was induced to make the statements by promises of leniency and that he did not understand the Miranda[3] rights that were read to him.

A
The appellant claims that his half-brother, Joshua Suttle, urged him to make a statement to the police. The appellant asserts that Suttle promised him that he would receive more lenient treatment if he confessed to the crime and that these promises, therefore, rendered his confession involuntary.
"The question of undue influence in obtaining admissions or confessions is determined by an examination of all attendant circumstances, with the inquiry focusing on whether the accused's free will and rational intellect were overborne at the time of his confession. Hubbard v. State, 500 So.2d 1204, 1220 (Ala.Cr.App.), aff'd, 500 So.2d 1231 (Ala.1986), cert. denied, 480 U.S. 940, 107 S.Ct. 1591, 94 L.Ed.2d 780 (1987); McCammon v. State, 499 So.2d 811, 815 (Ala.Cr.App.1986); Seawright v. State, 479 So.2d 1362, 1367 (Ala.Cr.App. 1985); Agee v. State, 465 So.2d 1196, 1198 (Ala.Cr.App.1984). `The factual inquiry centers on (1) the conduct of law enforcement officials in creating pressure and (2) the suspect's capacity to resist that pressure.' Seventeenth Annual Review of Criminal Procedure, 76 Geo.L.J. 676 (1988). `If an individual's "will was overborne" or if his confession was not "the product of a rational intellect and a free will," his confession is inadmissible because *1335 coerced.' Townsend v. Sain, 372 U.S. 293, 307, 83 S.Ct. 745, 754, 9 L.Ed.2d 770 (1963). `The types of promises which may make a defendant's statement involuntary are, e.g., promises of leniency, promises to bring the defendant's cooperation to the attention of the prosecutor, the disclosure of incriminating evidence to the accused, and silence in response to the defendant's offer to talk if his statement would not be used against him.' Siebert v. State, [562 So.2d 586, 592 (Ala.Cr.App.1989)]."
Siebert v. State, 555 So.2d 772, 776-77 (Ala. Cr.App.), aff'd, 555 So.2d 780 (Ala.1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990).
On June 4, 1991, Suttle, in cooperation with agents of the Alabama Department of Public Safety, while wearing a concealed microphone on his person, talked with the appellant and attempted to persuade him to confess to police. The appellant was not in the custody of law enforcement officers at the time. The following excerpts, transcribed in vernacular, are statements made by Suttle to the appellant during their conversation:
"Now, you bes' bet is go and turn yousef' in, my man. Go on over there and tell `em what happened. `Cause they gon' get you anyway. They gon' get yo' ass...."
"Best thang of' you to go and turn yousef' in. You know, go ahead and plead to what you did. Man, Wilber, an' `em, they know `bout it anyway."
"Yo' bes' thang is t'go over there, talk to `em, and tell `em what happened, man, cause, it'll be better that away. `Cause they gon' get proof, they'll get the guns, and thangs, man."
"They gon' get you, I'm tellin' you. You go do like I'm tellin' you. Go turn yo'sef in. See what I'm sayin'? Cause, it gon' come down ... they gon' call ... you gon' have to go t'court ... they gon' put all us in it, and we can't sit there and tell no lie, now. See what I'm sayin'?"
"So the best thang is jus' go on and turn yo'sef in, man."
"You know you did it, man, so you better go on and plead to what you did, tell where you put everthang at, you know. Do it that away...."
"Plead guilty to what you did."
"If I's you I'd go put that lawnmower up, go on down there, and tell `em what you did, man. If Peter Man tries to lie out of it, tell `em, tell `em what he did, too. That all I can tell you, man. I'm trying to help you out as much as I can. Stayin' back, talkin' `bout they ain't gon' find out? They gon' fine out. `Cause I know, they gon' find out you did the shit. You see what I'm sayin'? They fine out, they gon' be rough on you. You might as well go on and tell `em what you did. Tell `em where you put the guns and thangs at."
"See what I'm sayin'? Go on over there and tell `em, tell `em what you did man. That's yo' best out. You gon' get some time, you know, you did the crime. You got to do the dang time, man. See what I'm saying?"
"That'll be yo bes' out, man, I'm tellin' you. Tell you what I know, now. It's rough, but it's a decision you got to take."
The appellant does not contend that law enforcement officers induced him to confess; he alleges that his half-brother was acting as an agent of the police when he persuaded him to confess. Section 200.06, C. Gamble, McElroy's Alabama Evidence (4th ed. 1991), provides:

*1336 "A confession will not be regarded as having been induced by a threat or promise unless the threat or promise was made by a person who reasonably appeared to the accused to have the power or authority to execute the threat or procure performance of the promise. Ordinarily, a public official such as a sheriff, prosecuting attorney or judge will be regarded as having such apparent power and authority. However, the promise may render the confession inadmissible even though the promise was made by a person who held no public office or position. It has been held, for example, that the promise may come from any person connected with the prosecution, or connected with the accused, who may, considering his relations and condition be fairly supposed by the accused to have the power to secure for him whatever benefit is promised or to carry out the threatened injury."
(Footnotes omitted.)
The appellant had no reasonable basis to believe that Suttle had the authority to promise him leniency. Suttle did not indicate in any way during his conversation with the appellant that he was in a position to offer him leniency or that he was talking to him as an agent of law enforcement officials. Suttle's urging the appellant to confess did not render the appellant's statement involuntary.

B
The appellant also contends that his statement was involuntary because, he says, he did not understand the Miranda rights that he waived. The record shows that the appellant was informed of his right to counsel and of his right to remain silent. The record further shows that the appellant indicated that he understood these rights. The appellant signed a waiver of rights form.
The appellant does not now contend that he was not informed of these rights, but instead he argues that he did not have the mental capacity to understand these rights when they were read to him. The appellant did not present this argument at the suppression hearing, thus we must apply the plain error doctrine.
The appellant presented evidence of his diminished mental capacity during the sentencing phase of the trial. Dr. Robert Lyman, a psychologist, testified that the appellant had an IQ of 73, which places him in the borderline mentally retarded range, and the mental capability of a 12 or 13-year-old. The psychologist testified that tests revealed that the appellant suffered mild to moderate brain impairment in the areas of fine motor coordination, rhythm perception, speech, writing, reading, memory, and intellectual processes. Dr. Lyman also testified that the appellant exhibited the characteristics of someone afflicted with fetal alcohol syndrome.
Relatives and former teachers of the appellant also testified that the appellant's intelligence and mental skills were below average. There was testimony that he attended special education classes and graduated from high school. Ethel Evans Jones, one of the appellant's high school teachers, testified that the appellant could read "some" but that, in her opinion, he could not have understood all the terms in the rights waiver form that he signed.
Dr. Kathy A. Rogers, a certified forensic examiner at Taylor Hardin Secure Medical Facility, evaluated the appellant to determine his competency to stand trial. Although Dr. Rogers recognized the appellant's limited mental capacity, she did not find any evidence of a major psychiatric disorder. Dr. Rogers found that his intelligence level would not affect his ability to stand trial or his ability to distinguish between right and wrong. In her evaluation report on the appellant, Dr. Rogers stated:
"Mr. Dobyne understood his current charges, as well as the seriousness of these charges. He demonstrated adequate understanding of the range and nature of possible penalties should he be convicted, and his appraisal of the likely outcome of his case was fairly reasonable. He demonstrated a basic understanding of the roles of various courtroom personnel, including the defense attorney, prosecuting attorney, judge, jury, defendant, and witness. He understood that the role of the judge was `he sentences you, tells you the court date.' *1337 He understood that twelve people comprised a jury and that their job is to `tell if you're guilty or not guilty.'"
Having a low IQ will not render a waiver ineffective unless the individual's IQ is so low that the person attempting to waive his rights absolutely cannot understand his Miranda rights. Arnold v. State, 448 So.2d 489 (Ala.Crim.App.1984).
"We have often held that `the fact that a defendant may suffer from a mental impairment or low intelligence will not, without other evidence, render a confession involuntary.' See Colorado v. Connelly, 479 U.S. 157, 163-65, 107 S.Ct. 515, 520, 93 L.Ed.2d 473 (1986); Baker v. State, 599 So.2d 60, 63 (Ala.Cr.App.1991), State v. Austin, [596 So.2d 598 (Ala.Cr.App.1991)] supra, Holladay v. State, 549 So.2d 122 (Ala.Cr.App.1988), aff'd, 549 So.2d 135 (Ala.1989), cert. denied, 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989)."
Youngblood v. State, 656 So.2d 385, 387 (Ala. Cr.App.1993).
"[A] defendant's mental impairment, even if it exists, is merely one factor affecting the validity of his waiver of rights and the voluntariness of his confession. See generally Annot., 8 A.L.R. 4th 16 (1981). `While an accused's intelligence and literacy are important factors to be considered in determining whether he intelligently and voluntarily waived his constitutional rights and made a confession, weak intellect or illiteracy alone will not render a confession inadmissible.' Hobbs v. State, 401 So.2d 276, 282 (Ala.Cr.App.1981)."
Whittle v. State, 518 So.2d 793, 796-97 (Ala. Cr.App.1987).
Although it is undisputed that the appellant's mental capabilities were below average, but "average" is the middle mark, there is no evidence that the appellant could not understand that he had the right to remain silent and that he had the right to an attorney. The court did not err in receiving the appellant's confession into evidence at trial.

XIV
The appellant contends that the court erred in receiving several items into evidence. Specifically, the appellant contends that the state did not establish a sufficient predicate for a tape-recording that was played for the jury, two shotguns that were received into evidence, and several items that had been taken from the store during the robbery that were also received into evidence.

A
At trial, the state played a taped conversation between the appellant and Joshua Suttle. The conversation was taped on June 4, 1991, using a recording device placed on Joshua Suttle's body. The original tape contained conversations that Suttle had with the appellant and with other people. The recording that was played for the jury was an edited version of the original tape and contained only the conversation relevant to this case, which was the conversation between the appellant and Suttle. Defense counsel, while reserving an objection concerning a sufficient predicate, stated:
"The Defendant is satisfied that the tape edited by the State and the transcript marked State's Exhibit No. 65, are accurate transcriptions of the original tape edited so as to remove any irrelevant material agreed on by the State."
Marvin Roye, a corporal with the Alabama Bureau of Investigation, testified at trial concerning the tape-recording of the conversation between the appellant and Suttle. Roye testified that the original tape-recording correctly represented the conversation between the appellant and Suttle that he heard during his surveillance of the appellant on June 4, 1991. He further testified that, at the court's direction, he edited a copy of the tape to eliminate the irrelevant portions. It was this edited version that was played for the jury.
"This court held in Molina v. State, 533 So.2d 701 (Ala.Cr.App.1988), cert. denied, 489 U.S. 1086, 109 S.Ct. 1547, 103 L.Ed.2d 851 (1989), that `"sound tapes ... are admissible when a witness testifies they are reliable representations of the subject sound."' 533 So.2d at 712, quoting C. Scott, 3 Photographic Evidence ง 1297 at 97 n. 42, 5 (2d ed. 1969) (1987 Pocket Part); *1338 see also Jackson v. State, 582 So.2d 598 (Ala.Cr.App.1991)."
Wyatt v. State, 620 So.2d 77, 79 (Ala.Cr.App. 1992).
Based on Corporal Roye's testimony that the taped conversation was the same as the one he heard on June 4, 1991, the state presented a sufficient predicate for the admission of the tape recorded conversation into evidence.

B
The appellant also contends that the court erred in receiving two shotguns into evidence. The appellant contends that the state failed to establish that the shotguns that were received into evidence were the shotguns that were used to kill Billingsley and Snipes.
The shotguns received into evidence at trial were found by divers in Haysop Creek. Anthony Parker, who was with the appellant and his codefendant on January 11, 1991, earlier on the night of the murders, testified that one of the shotguns belonged to his father and that it was the same shotgun that he had had in his trailer that night. He said that the other shotgun looked like the other shotgun in his trailer that night. He testified that when the appellant and the codefendant went to bed that night, the two shotguns were in the bedroom in which they were sleeping. Parker said that when he awoke the next morning, January 12, the appellant, the codefendant, and the two shotguns were gone.
The transcript of the tape-recorded conversation between the appellant and Joshua Suttle that was received into evidence at trial, reveals that the following occurred:
"Dobyne: They ain't gon' fine no guns.
"Suttle: You don' thank so?
"Dobyne: Uh uh.
"Suttle: They fine `em. Who gun ya'll had?
"Dobyne: ... We had Squirt's gun, and... Parker's.
"Suttle: Squirt? Who in the hell is Squirt?
"Dobyne: That boy, ah, Bobby Dukes son.
". . . .
"Suttle: ... Tell `em where you put the guns and thangs at.
"Dobyne: I don't know where them at, Peter....
"Suttle: Oh, he hid the guns?
"Dobyne: Yeah.
"Suttle: Who hid the cash register?
"Dobyne: Thowed it in the river."
Based on the testimony of Anthony Parker and the statements made by the appellant, it appears that the state presented sufficient evidence from which the jury could reasonably infer that the shotguns found in Haysop Creek were the shotguns used to murder Billingsley and Snipes.
"Although the general rule is that items must be properly identified and shown to be connected with the crime, this is not an absolute rule. Where there is sufficient evidence to justify a reasonable inference that items were used by the accused in the commission of the crime charged, those items are admissible. 22A C.J.S. Criminal Law ง 712 (1961)."
Hayes v. State, 443 So.2d 1323, 1325 (Ala.Cr. App.1983); see also Mims v. State, 591 So.2d 120 (Ala.Cr.App.1991).
The court did not err in receiving the shotguns into evidence.

C
The appellant also contends, in his brief, that the trial court erred in receiving certain testimony of Kenneth Manlief, a state trooper assigned to the Alabama Bureau of Investigation. The appellant contends that Manlief's testimony concerning items that he discovered in a deserted area near the County Truck Stop should have been excluded because, he says, Manlief did not identify the items and he did not show that they were taken from the truck stop. The appellant did not object to this testimony at trial; thus we apply the plain error doctrine.
The following is an excerpt from Manlief's testimony, which the appellant contends should not have been admitted into evidence:

*1339 "Q [prosecution].... Now going to June 1, 1991, do you recall what you did on that date?
"A [Manlief] Yes, Ma'am.
"Q What is that?
"A Myself and, I guess officers of the county, went back to Max Branch Road and searched the area for more evidence that came from the [County Truck Stop and] Sawmill Restaurant.
"Q And do you recall about what time it was that y'all went?
"A I have no recollection of that.
"Q All right. and when you went there, what, if anything, did you find?
"A We found a credit card from the City of Brent. Several other items. Pieces of the cash register is there, including key parts. I do not have the property receipt which indicates all items that were taken there. Like I say, we found a lot of items that were representative of items that were taken from the [County Truck Stop].
"Q Let me show you what has been marked as State's Exhibit No. 24 and ask you if you recognize that?
"A Yes, ma'am.
"Q What is that?
"A This is a Unocal 76 credit card for the City of Brent."
The state presented evidence that the City of Brent had one Unocal 76 credit card that was in the possession of the County Truck Stop. Manlief testified that he found this credit card in the same area in which he found parts of a cash register. A cash register was stolen from the County Truck Stop. This creates a strong inference that the cash register parts that Manlief found were parts of the cash register stolen from the County Truck Stop. See Mims, supra; Hayes, supra.
There was no error in allowing Manlief to testify as to items found near the truck stop that were, as he stated at trial, "representative of items that were taken from the [truck stop]."

XV
The appellant next contends that the state failed to prove the corpus delicti of the robbery. Specifically, the appellant contends that there was no evidence, other than his statement, showing a "theft of United States currency."
The appellant's contention is contradicted by the record. The state presented evidence that on January 11, 1991, at approximately 11 p.m., Bob Rinehart, who was chief of police of Brent at the time, entered the County Truck Stop and purchased two drinks with $2.00. He saw Snipes put the $2.00 in the cash register. At approximately 3:00 a.m. on January 12, 1991, Rinehart entered the truck stop again and found that the cash register had been stolen and the store employees had been killed. The manager of the store, Mr. Wilson, also testified that when he left the store at approximately 10:00 p.m., there was approximately $200 in the cash register.
The appellant also contends that the state failed to prove the corpus delicti of murder. Specifically, the appellant contends that there was no evidence, other than his statement, that he murdered Billingsley or Snipes. The appellant's contention, however, is related to the sufficiency of the evidence rather than the corpus delicti.
The term "corpus delicti" is defined in the sixth edition of Black's Law Dictionary as "the substantial fact that a crime has been committed...." Here Billingsley and Snipes were killed by shotgun blasts in the County Truck Stop. Money and other items were taken from the store. There was substantial, undeniable proof that two murders had been committed. The appellant's argument concerning the sufficiency of the evidence against him in no way goes to the fact that two murders were committed.
However, we will address the appellant's contention that there was insufficient evidence to support his convictions for murder. First of all, the appellant confessed to participating in the robbery and murders. Statements that the appellant made led to the discovery of corroborating evidence. For instance, the appellant said that he and the codefendant threw the cash register from the *1340 County Truck Stop into a river. Parts of the cash register were found in a creek. Additionally, two shotguns were found in the creek. These were identified as the same shotguns that had been in the possession of the appellant and his codefendant earlier on the night of the murders.
This evidence presented by the state provided sufficient support for the jury's determination that the appellant was guilty of the murders of Billingsley and Snipes.

XVI
The appellant next contends that the prosecutor committed reversible error in his closing arguments in the guilt phase of the proceedings. Initially, we observe that no objection was made to the closing arguments of the prosecutor; therefore, we must evaluate this contention under the plain error doctrine. "[T]he failure to object will weigh against any claim of prejudice." Ex parte Hart, 612 So.2d 536, 537 (Ala.1992), cert. denied, 508 U.S. 953, 113 S.Ct. 2450, 124 L.Ed.2d 666 (1993).
""This court has concluded that the failure to object to improper prosecutorial arguments ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful.'"
Kuenzel, 577 So.2d at 489, quoting Johnson v. Wainwright, 778 F.2d 623, 629 n. 6 (11th Cir.1985), cert. denied, 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987).
The prosecutor argued the following in his closing:
"You, the judge, two defense attorneys, and Mr. Johnson and myself, have tried to make sure that Willie Dobyne gets a fair trial by a jury of his peers, by an impartial jury. Let me just leave you with this thought. What kind of trial did Leon Billingsley and Linda Snipes get? Their trial was in the early morning hours of January 12, 1991, and this man right here was the judge, the jury, and the executioner. And that trial lasted approximately one minute for each of those people. They lay on that floor. One, Mississippi, two Mississippi. Three Mississippi."
Appellate counsel asserts in his brief that the above argument "told the jurors that Mr. Dobyne was not entitled to an impartial verdict from them and suggested that they should somehow weigh against the appellant the fact that he had received a trial because the person who killed the victims did not afford them a `fair trial.'"
As the United States Supreme Court in Darden v. Wainwright, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), stated:
"[I]t `is not enough that the prosecutors' remarks were undesirable or even universally condemned.' Darden v. Wainwright, 699 F.2d [1031] 1036 [(1983)]. The relevant question is whether the prosecutors' comments `so infected the trial with unfairness as to make the resulting conviction a denial of due process' Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)."
477 U.S. at 181, 106 S.Ct. at 2471, 91 L.Ed.2d at 157.
This court in Henderson v. State, 584 So.2d 841 (Ala.Cr.App.1988), considered the propriety of a similar argument. We stated:
"[T]he prosecutor's comment that the appellant apparently believed in capital punishment, because he served as judge, jury, and executioner for the victim, was not error. The prosecutor has the right to argue his opinion from the record."
584 So.2d at 857.
Furthermore, the trial court instructed the jury that arguments of counsel were not to be considered as evidence in the case. We find it highly unlikely that this argument affected the jury's decision and denied appellant due process. Darden v. Wainwright, supra.
The appellant further contends that the following comment made in closing effectively instructed the jurors that they would have to answer to the ghosts of the victims:
"Now, as Mrs. Wilson told you at the onset, Leon and Linda aren't here today. They're six feet under. They didn't have a trial. But they really are here with you today and they're watching and listening to *1341 everything that we do and we have done. Y'all keep them in mind."
The argument told the jurors to keep the victims in mind when they were making a decision. This argument did not amount to reversible error.
In McNair v. State, 653 So.2d 320 (Ala.Cr. App.1992), the prosecutor argued in his closing statement that the victim "`had a right to live, a right to come and go, to breathe, and a right to be protected. Just like [the appellant] has Constitutional rights that should be protected, so does she. So does she.'" McNair, 653 So.2d at 336. This court, finding no reversible error, stated:
"The prosecutor made numerous references to the victim's rights and several times implied that her rights were to be weighed against the appellant's. This was clearly improper. However, we think these references were valued by the jury at their true worth, as having been uttered in the heat of debate and were not expected to become factors in the formation of the verdict. See Duren v. State, 590 So.2d 360, 364 (Ala.Cr.App.1990), affirmed, 590 So.2d 369 (Ala.1991), cert. denied, 503 U.S. 974, 112 S.Ct. 1594, 118 L.Ed.2d 310 (1992); Bankhead v. State, 585 So.2d 97, 106 (Ala.Cr.App.1989), affirmed as to instant issue and remanded on other grounds, 585 So.2d 112 (Ala.1991) (on rehearing), affirmed on return to remand, 625 So.2d 1141 (Ala.Cr.App.1992); Harris v. State, 539 So.2d 1117, 1123 (Ala.Cr.App. 1988)."
McNair, 653 So.2d at 337-38.
We find the comments made in closing argument in McNair, in which this court found no reversible error, more offensive than the comments made in the instant case. No reversible error exists here.

XVII
The appellant next contends that the court's guilt phase instructions to the jury were "fatally flawed." The appellant cites several reasons for this assertion.
Initially, the appellant contends that the overall instructions resulted in error because, he says, they provided no alternative means by which the jury could find that the appellant killed one of the store employees and not the other. As stated in Part I of the opinion, the appellant was indicted under one count for the murders during a robbery of Leon Billingsley and Linda Snipes. To convict the appellant under the crime charged in the indictment, the jury had to find that the appellant intentionally caused the death of both victims during a robbery. The court's instruction was consistent with the indictment.
The appellant further argues that the court's instruction was flawed because, he says, it instructed the jury that it could convict the appellant of the robbery-murder of Linda Snipes even though he had no specific intent to kill her.
This court has stated that a defendant may not be found guilty of murder made capital under ง 13A-5-40 unless he has the specific intent to kill. Jenkins, supra.
The trial court gave the following instructions:
"A person commits the crime of murder if he causes the death of another person, and in performing the acts or act which caused the death of that person, he intends to kill that person or another person.
"A person commits the crime of robbery in the first degree, if, in the course of committing a theft, he uses or threatens the imm[i]nent use of force against the person of the owner of the property or any person present with intent to overcome that person's physical resistance, or physical power of resistance, and in so doing, he's armed with a deadly weapon.
"Therefore, to convict under the indictment for the charge of murder during robbery, the State must prove each of the following elements beyond a reasonable doubt: that Linda Snipes is dead. That the Defendant, Willie C. Dobyne, caused the death of Linda Snipes by shooting her and that in committing the act which caused the death of Linda Snipes, the Defendant acted with intent.
"The State must also prove beyond a reasonable doubt that Leon Billingsley is dead. That the Defendant, Willie C. Dobyne, *1342 caused the death of Leon Billingsley by shooting him, and that in committing the act which caused the death of Leon Billingsley, the Defendant acted with intent. The State must also prove beyond a reasonable doubt each of the following elements of robbery in the first degree. That the Defendant, Willie Dobyne, committed or attempted to commit theft of United States currency. That in the course of committing or attempting to commit the theft or in immediate flight after the attempt or commission, the Defendant either used force, or threatened the imminent use of force against the person of Linda Snipes or Leon Billingsley, with the intent to overcome their physical power of resistance or physical power to resist, or to compel acquiescence to the taking of the property and that the Defendant was armed with a deadly weapon.
"A person commits the crime of theft of property if he knowingly obtains or exerts unauthorized control over the property of another with intent to deprive the owner of his property.
"A deadly weapon is a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious physical injury. A deadly weapon includes, but is not limited to, a shotgun. A person acts intentionally if his purpose is to cause the death of another person.
"There's been some reference by the attorneys to complicity. A person is criminally liable for a crime if either it was committed by his own behavior, or it was committed by the behavior of another person for whom he's legally accountable. The definition of complicity is, a person is legally accountable for the behavior of another person constituting a crime if, with intent to promote or assist the commission of the crime, he either procures, induces, or causes such other person to commit the crime, or aids or abets such other persons in committing the crime.
"If you find from the evidence that the State has proved beyond a reasonable doubt each of the above elements of the offense of intentional murder with regard to Linda Snipes, and as regards Leon Billingsley, and each of the above elements as to the offense of robbery in the first degree, then you shall find the Defendant guilty of murder during robbery.
"If you find that the State has failed to prove beyond a reasonable doubt any one or more of the elements of the offense of murder of Linda Snipes, murder of Leon Billingsley, or robbery in the first degree, then you cannot find the Defendant guilty of murder during robbery as charged in this indictment."
The court instructed the jury that it had to find that the appellant intended to kill both of the victims before he could be found guilty of capital murder. Sockwell v. State, [Ms. CR-89-225, December 30, 1993] ___ So.2d ___ (Ala.Cr.App.1993).
The appellant next asserts that the court's reasonable doubt instruction diminished the state's burden of proof and violated the United States Supreme Court's holding in Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990).
"In Cage v. Louisiana, [498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990)] the United States Supreme Court found that if the instruction equated `reasonable doubt' to `grave uncertainty' and `actual substantial doubt,' and stated that what was required was `moral certainty,' a reasonable jury could interpret the instruction to allow a lesser degree of proof to convict than that required by the Due Process Clause. It was the use of all three phrases in conjunction with each other that the Supreme Court determined was unconstitutional in Cage. Gaskins v. McKellar, 500 U.S. 961, 111 S.Ct. 2277, 114 L.Ed.2d 728 (1991)."
Sockwell, ___ So.2d at ___.
The court gave the following instruction on reasonable doubt:
"The phrase `reasonable doubt' is selfexplanatory. Efforts to define it do not always clarify the term, but it may help you some to say the doubt which would justify an acquittal must be a doubt for which you can assign a reason.
"Not a mere guess, or surmise or whim, and it is not a forced or captious doubt.

*1343 "I charge you that if you have a reasonable doubt of the Defendant's guilt growing out of the evidence or any part of it, you should acquit him.
"If, after considering all of the evidence in the case, you have an abiding conviction of the truth of the charge, then you've convinced beyond a reasonable doubt and it would be your duty to convict the Defendant.
"The reasonable doubt which entitles a defendant to an acquittal is not a mere fanciful vague, conjectural or speculative doubt, but a reasonably substantial doubt arising from all or any part of the evidence or lack of evidence and remaining after a careful consideration of the testimony such as reasonable, fair-minded and conscientious men and women would entertain under all the circumstances.
"Each juror is entitled to decide for himself or herself whether a doubt he or she entertains is reasonable or not. If it appears reasonable to him or her, it is his or her duty to find the Defendant not guilty.
"A reasonable doubt is a fair doubt based upon reason and common sense and arising from the state of the evidence. A reasonable doubt may arise not only from the evidence adduced, but also from a lack of the evidence. The burden is upon the State to prove the Defendant guilty beyond a reasonable doubt of every essential element of the crime charged. A defendant has the right to rely upon failure of the prosecution to establish such proof. A defendant may also rely upon evidence brought out on cross-examination of the witnesses or the prosecution, and upon evidence presented on behalf of the Defendant. The law never imposes upon a defendant in a criminal case the burden of producing any evidence. A reasonable doubt exists in this case when, after careful and impartial consideration of all the evidence in the case, the jurors do not feel convinced beyond a reasonable doubt that a defendant is guilty of the charge."
Use of some but not all of the terminology found offensive in Cage does not automatically constitute reversible error. Stewart v. State, 601 So.2d 491 (Ala.Cr.App.1992), rev'd in part and remanded on other grounds, 659 So.2d 122 (Ala.1992); Williams, supra; Murphy v. State, 596 So.2d 42 (Ala. Cr.App.1991), writ denied, 596 So.2d 45 (Ala.), cert. denied, 506 U.S. 827, 113 S.Ct. 86, 121 L.Ed.2d 49 (1992); Adams v. State, 587 So.2d 1265 (Ala.Cr.App.1991).
Recently, the United States Supreme Court revisited the reasonable doubt charge in Victor v. Nebraska, 511 U.S. 1, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994). Victor involved reasonable doubt instructions given in petitioners Sandoval and Victor death penalty cases. The United States Supreme Court, while finding no error in the court's instructions, further explained its holding in Cage.
The instructions given in Sandoval's case equated reasonable doubt with "moral evidence" and "moral certainty." The court found that defining reasonable doubt by using the term "moral evidence" did not induce the jury to convict Sandoval on less than reasonable doubt. The United States Supreme Court stated the following concerning "moral certainty":
"In the Cage instruction, the jurors were simply told that they had to be morally certain of the defendant's guilt; there was nothing else in the instruction to lend meaning to the phrase. Not so here. The jury in Sandoval's case was told that a reasonable doubt is `that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charge.' Sandoval App. 49.... The instruction thus explicitly told the jurors that their conclusion had to be based on the evidence in the case. Other instructions reinforced this message. The jury was told `to determine the facts of the case from the evidence received in the trial and not from any other source.' Id., at 38. The judge continued that `you must not be influenced by pity for a defendant or by prejudice against him.... You must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion *1344 or public feeling.' Id., at 39. Accordingly, there is no reasonable likelihood that the jury would have understood moral certainty to be disassociated from the evidence in the case."
Victor, 511 U.S. at ___, 114 S.Ct. at 1248.
Sandoval's instruction also contained the phrase "not a mere possible doubt." The Court stated that this phrase was accurate because "`[a] "reasonable doubt," at a minimum, is one based upon "reason."'" Victor, 511 U.S. at ___, 114 S.Ct. at 1248.
In Victor's case, the trial court's instruction on reasonable doubt equated reasonable doubt with a "substantial doubt." Victor argued that by equating those terms the court "overstated the degree of doubt necessary for acquittal." The United States Supreme Court distinguished this instruction from the instruction given in Cage. The United States Supreme Court stated:
"We did say in [Cage] that `the words "substantial" and "grave," as they are commonly understood, suggest a higher degree of doubt than is required for acquittal under the reasonable doubt standard.' 498 U.S., at 41 [111 S.Ct. at 329]. But we did not hold that the reference to substantial doubt alone was sufficient to render the instruction unconstitutional. Cf. Taylor v. Kentucky, 436 U.S. [478], 488 [98 S.Ct. 1930, 1936, 56 L.Ed.2d 468 (1978)] (defining reasonable doubt as a substantial doubt, `though perhaps not in itself reversible error, often has been criticized as confusing').... Rather, we were concerned that the jury would interpret the term `substantial doubt' in parallel with the preceding reference to `grave uncertainty,' leading to an overstatement of the doubt necessary to acquit. In the instruction given in Victor's case, the context makes clear that substantial is used in the sense of existence rather than magnitude of the doubt, so the same concern is not present.
"In any event, the instruction provided an alternative definition of reasonable doubt: a doubt that would cause a reasonable person to hesitate to act. This is a formulation we have repeatedly approved, Holland v. United State, 348 U.S. [121] 140 [75 S.Ct. 127, 137-138, 99 L.Ed. 150 (1954)]; cf. Hopt v. Utah, 120 U.S. [430] 439-441 [7 S.Ct. 614, 618-620, 30 L.Ed. 708 (1887)], and to the extent the word `substantial' denotes the quantum of doubt necessary for acquittal, the hesitate to act standard gives a common-sense benchmark for just how substantial such a doubt must be. We therefore do not think it reasonably likely that the jury would have interpreted this instruction to indicate that the doubt must be anything other than a reasonable one."
Victor, 511 U.S. at ___, 114 S.Ct. at 1250.
The instruction in Victor's case also referred to the standard "strong probabilities." Victor argued that this statement "understated the government's burden." The Court stated, taking the instruction as a whole, "`While it is true that [the challenged instruction] used the words "probabilities" and "strong probabilities," ... it emphasized the fact that those probabilities must be so strong as to exclude any reasonable doubt, and that is unquestionably the law (citing Hopt v. Utah, [120 U.S. 430] 439 [7 S.Ct. 614, 618, 30 L.Ed. 708 (1887)]." Victor, 511 U.S. at ___, 114 S.Ct. at 1251.
In this case, the court's instruction thoroughly and accurately defined reasonable doubt. The court told the jurors that reasonable doubt must be based "on the state of the evidence." The instructions contained none of the terms that the United States Supreme Court found questionable in Victor and reversible in Cage.
The appellant next contends that the court's instruction on witness credibility "created a presumption of truth in favor of the state's evidence." We can find no such instruction in the court's charge. The court did give the following instruction on witness credibility:
"You should take the testimony of the witnesses, together will all proper and reasonable inferences therefrom, apply your common sense, and in an honest and impartial way, determine what you believe to be the truth. You should weigh all the evidence and reconcile it if possible, but if it cannot be reconciled, you ought to take that evidence which you think is worthy of *1345 credit and give it just such weight as you think it's entitled to.
"You may take into consideration any interest any witness might have in the outcome of this case. You may take into consideration any bias or interest or prejudice that might have been exhibited to you while a witness testified. You have a right to consider such things as the demeanor of the witness on the stand. That is, how they appeared to you while they testified. Did they testify frankly and straight forwardly or evasively? These are things you can consider. You have the right to consider what basis that they had for testifying. How they knew the facts they testified about. Whether they had an opportunity to know these facts. These things you may consider in passing upon the credibility of the witnesses.
"If you believe that any material part of the evidence of any witness is willfully false, you may disregard all the testimony of such witnesses.
"Credibility of a witness is solely for the jury to decide. The mere fact that a witness was called by the State or is now or has been a state or county or city agent, does not entitle such witness' testimony anymore credence than that of any other witness. As I said, the credibility of witnesses is solely for your determination."
The court did not state in its instruction that the testimony of witnesses for the state was entitled to more weight than the testimony of other witnesses. The above instruction was not error.
The appellant also asserts that the court erred in not ex mero motu instructing the jury concerning the voluntariness of the appellant's confession that was received into evidence. Initially, we observe that this issue was not brought to the attention of the trial court; thus the plain error doctrine applies. We further observe that appellant's only objection concerning his statement at trial was that Joshua Suttle promised leniency if the appellant would make a statement.
We have thoroughly examined the court's instruction and find it both thorough and accurate concerning the credibility of the evidence presented at trial. We find no plain error here.
Last, the appellant argues that the court erred in failing to instruct the jury on the lesser included offense of felony murder. Initially, we observe that no objection was made to this to the trial court; thus the plain error doctrine applies.
Lesser included offense instructions should be given when there is a "reasonable theory from the evidence" supporting such an instruction. Jenkins, supra. Here, there was no reasonable theory to support a charge on felony-murder. "`[T]he purpose of the felony-murder doctrine is to hold felons accountable for unintended deaths caused by their dangerous conduct.'" White v. State, 587 So.2d 1218, 1231 (Ala.Cr.App.1990), aff'd, 587 So.2d 1236 (Ala.1991), cert. denied, 502 U.S. 1076, 112 S.Ct. 979, 117 L.Ed.2d 142 (1992). Here, the evidence did not show that the shootings were unintended. The court did not err in not instructing the jury on the lesser included offense of felony-murder. We note that the court did instruct the jury on the lesser included offenses of murder and manslaughter.

PENALTY PHASE

XVIII
The appellant raises the following issues concerning the penalty phase of the proceedings. The appellant initially argues that the trial court erred in refusing to provide him with the expert assistance of a neurologist, who, he says, could have testified in mitigation about his brain damage.
The United States Supreme Court in Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), held:
"[W]hen a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense. This is not to say, of course, that the indigent defendant has a constitutional right to choose a psychiatrist of his personal *1346 liking or to receive funds to hire his own."
470 U.S. at 83, 105 S.Ct. at 1096, 84 L.Ed.2d at 66.
The state initially argues that Ake applies only to psychiatrists. However, this court recently in Dubose v. State, 662 So.2d 1156 (Ala.Cr.App.1993), concluded otherwise. We stated:
"[C]ourts of this state recognize that the holding of Ake extends beyond a request for psychiatric assistance to require that the state provide the indigent defendant with other types of expert assistance upon a sufficient showing. We wholeheartedly agree with the following:
"`There is no principled way to distinguish between psychiatric and nonpsychiatric experts. The question in each case must be not what field of science or expert knowledge is involved, but rather how important the scientific issue is in the case, and how much help a defense expert could have given.'
"Little v. Armontrout, 835 F.2d 1240, 1243 (8th Cir.1987), cert. denied, 487 U.S. 1210, 108 S.Ct. 2857, 101 L.Ed.2d 894 (1988)."
Dubose, 662 So.2d at 1178.
However, before the court is obliged to appoint an expert for an indigent defendant the defendant must satisfy the following:
"`The threshold question requires the showing of a need for the requested services. Ex parte Argo, 42 Ala.App. 546, 547, 171 So.2d 259 (1965). We recognized in Gwin v. State, 425 So.2d 500, 508 (Ala. Cr.App.1982), cert. quashed, 425 So.2d 510 (Ala.1983), that before determining whether fundamental fairness requires that an accused be afforded the opportunity to have an expert of his choosing examine a piece of "critical evidence whose nature is subject to varying expert opinion," it should first be determined that the evidence is "critical." Evidence is "critical" for purposes of the due process clause if it could induce a reasonable doubt in the minds of enough jurors to avoid a conviction when that evidence was developed by skilled counsel and experts. White v. Maggio, 556 F.2d 1352, 1357-58 (5th Cir. 1977); Gwin, supra.'"
Ex parte Sanders, 612 So.2d 1199, 1201 (Ala. 1993), quoting, Grayson v. State, 479 So.2d 69, 72 (Ala.Cr.App.1984), affirmed, 479 So.2d 76 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985). See also Dubose, supra.
Here, the record shows that the appellant pleaded guilty by reason of mental disease or defect.[4] On motion of the appellant, the court ordered that the appellant be evaluated at Taylor Hardin Secure Medical Facility. Dr. Kathy Rogers evaluated the appellant. Dr. Rogers found that the appellant had a limited mental capacity but determined that he was competent to stand trial. On January 24, 1992, the appellant filed a motion to hire a "mitigation investigator." The appellant cited in support of this motion the facts that his mother left him when he was two years' old, that his father and mother both abused alcohol, that his mother was addicted to heroin, that he had a cocaine habit at the time of the crime, and that he had had attacks during which he could not breathe and had had chest pains. This motion was granted. On March 23, 1992, the appellant filed a motion to hire a psychologist, claiming that he had a low IQ, that he had a history of abuse of drugs, that he suffered from "spells," and that he had suffered at least two head injuries when he was a child. Attached to this motion was a letter from Dr. Robert Lyman, a clinical psychologist at Druid City Hospital in Tuscaloosa. Dr. Lyman stated:
"I definitely feel that a possible history of fetal exposure to high maternal blood alcohol levels, history of head injury, low IQ, tremor, and family history of seizure disorder indicate the need for comprehensive neurological and neuropsychological evaluation in order to address questions of competence and mitigating circumstances in any criminal action. I believe that `standard' psychiatric and psychological evaluations *1347 would not adequately assess these factors."
Dr. Lyman further stated that he would conduct a neuropsychological evaluation of the appellant. This motion was granted, and Dr. Lyman conducted a neuropsychological examination of the appellant.
On April 16, 1992, two weeks before appellant's trial was scheduled, defense filed a motion to hire a neurologist. In this motion the appellant named a certain neurologist who would perform the examination and stated that the cost would be approximately $2,200. The trial court denied this motion. We hold that the court did not err in denying this motion.
The appellant presented much evidence at the penalty phase as to the state of his mental health. Dr. Lyman testified that the appellant had mild to moderate impairment in a variety of areas, including rhythm perception and reading. He also testified that the appellant exhibited characteristics of someone afflicted with fetal alcohol syndrome and that he had suffered head injuries as a child. The jury at the penalty phase had an abundance of evidence presented to it concerning the appellant's low IQ, his addiction to drugs, his impairment in certain areas, and the fact that he had suffered head injuries as a child.[5] The appellant offered a great deal of expert testimony in mitigation at the penalty phase. The appellant has failed to satisfy the requirements of Ake and Sanders. No reversible error occurred here.

XIX
The appellant further contends in a supplemental brief that the penalty phase jury was deprived of a vital piece of mitigating evidence and that, therefore, his sentence to death should be vacated. Specifically, the appellant contends that the jury should have been informed that the appellant's codefendant received a sentence of life in prison without parole.
As the state correctly notes, this information was not in existence at the time of the appellant's penalty hearing. The appellant's codefendant negotiated a plea agreement with the state months after the penalty phase of appellant's trial. Furthermore, this information was not evidence that mitigated the appellant's participation in the crime. No error occurred here.

XX
The appellant next contends that several comments by the prosecutor in his closing arguments in the penalty phase amounted to reversible error.
The appellant contends in his brief that this court has "recognized that more careful scrutiny is required of prosecutorial misconduct at the sentencing hearing of a capital trial." The appellant cites McNair, supra, for this proposition. We do not agree with the appellant's interpretation of McNair. In McNair, we stated:
"Many of the guilty-phase arguments, which we have found improper but not prejudicial enough to cause a reversal of the conviction, would not;โif made in the context of the sentence phaseโbe equally amenable to harmless error analysis. See Mills v. Maryland, 486 U.S. 367, 376, 108 S.Ct. 1860, 1866, 100 L.Ed.2d 384 (1988) (`[i]n reviewing death sentences, the Court has demanded even greater certainty that the jury's conclusions rested on proper grounds'); Woodson v. North Carolina, 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976) (because of the `qualitative difference' between the death penalty and any other punishment, there is a heightened `need for reliability in the determination that death is the appropriate punishment in a specific case'); Ala.Code 1975, ง 13A-5-53(b)(1) (this Court must review `[w]hether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor')."
653 So.2d at 341. (Emphasis supplied.)
We recognize that there is a "heightened need for reliability" in the penalty stage of a capital case. However, McNair did not establish *1348 a different test for evaluating the prosecutor's comments in the penalty phase of a capital case. This court is obliged to apply the standard articulated in the United States Supreme Court case of Darden v. Wainwright, supra. When reviewing a prosecutor's comment made in closing argument, we must determine whether the comment "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. at 181, 106 S.Ct. at 2471, 91 L.Ed.2d at 157.
The appellant first contends that the prosecutor's comment concerning the appellant's lack of remorse was a direct comment on his failure to testify and therefore violated his constitutional rights. The following occurred during closing arguments in the penalty phase:
"Now, one of the most interesting points that I found missing and maybe it's because of religious upbringing and everything, but if you read the linchpin to the whole case, obviously the police investigation was in the tape that Joshua Suttle made and the statements that Dobyne gave Bob and Marvin Roye at Brent City Hall. Look at that statement very carefully. Another fact, Milwaukee. The dates were kind of confused. April being four months when he was obviously arrested in June. Maybe it was earlier that spring of '91 that he was in Milwaukee. After the acts in January, Milwaukee would be a convenient place to go. But look at the words in the statement and look at the words and listen to the words on the tape again. There's a concern about they don't have any fingerprints. They'll never find the guns. They'll never find stuff. They don't have enough evidence. Is there any words in any of those that spell out something that hasn't been mentioned at all? It's a word that's called `remorse.' Remorse.
"MR. Fawwal [defense counsel]: We have an objection.
"Mr. Johnson [prosecutor]: Everything in those statementsโ
"The court: Approach the bench.
"Mr. Fawwal: Your Honor, he's commenting on the fact thatโ
"Mr. Johnson: I have not. I prefaced that clearly by his statements, is what I'm talking about.
"Mr. Fawwal: What he's saying is the one thing he's never heard was remorse. If he's never heard anything about remorse, that's an indirect comment on the defendant's failure to testify.
"Mr. Johnson: I prefaced it carefully about his statements in the tape is what I'm talking about.
"The Court: I don't think he's done anything improper. Overruled.
"(By Mr. Johnson.) Remorse. You know, all of us, our Bill of Rights guarantees us freedom of religion. All of us have different religious beliefs ... protected by the Constitution. We go to churches of all sort of denominations. You know, some churches have communion. My church has communion. It gives us a change to absolve ourselves of sin by begging our Maker for forgiveness. Being truly sorry and repentant of things you've done. Read those statements. Read it again and listen to the tape again. Is there any of that in there? I defy you to find it. It's not there."
The Alabama Supreme Court recently restated the standard used when determining whether a comment made by the prosecutor is a comment on the accused's right to testify. The Court stated:
"In Ex parte Wilson, 571 So.2d 1251, 1261 (Ala.1990), this Court cited the standard endorsed by the United States Court of Appeals for the Eleventh Circuit:
"`"[A] statement by a prosecutor is improper if it was manifestly intended to be, or was of such a character that the jury would naturally and necessarily take it to be, a comment on the failure of the accused to testify." Marsden v. Moore, 847 F.2d 1536, 1547 (11th Cir.), cert. denied, 488 U.S. 983, 109 S.Ct. 534, 102 L.Ed.2d 566 (1988); United States v. Betancourt, 734 F.2d 750, 758 (11th Cir.), cert. denied, 469 U.S. 1021, 105 S.Ct. 440, 83 L.Ed.2d 365 (1984).'"
Windsor, ___ So.2d at ___.
We cannot say that the above argument was a comment on the appellant's failure to *1349 testify. The prosecutor was commenting on the appellant's demeanor when he made his statement to police. This was a legitimate comment on the evidence presented during the course of the trial and a correct subject for closing argument.
The appellant further asserts that the argument by the prosecutor on remorse was improper because the prosecutor was urging the jurors to consider the appellant's lack of remorse as an aggravating circumstance. However, throughout the prosecutor's argument he referred to the fact that the state was relying on one aggravating factorโthat the murder occurred during a robbery. The trial court further instructed the jury that it had only one aggravating factor to considerโthat the murder occurred during a robbery. We do not believe that the comment on the lack of remorse "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, U.S. at 181, 106 S.Ct. at 2471, 91 L.Ed.2d at 157.
The appellant next contends that the prosecutor committed error when he stated during closing arguments that "capital punishment is society's right to defend itself." As Judge Bowen stated in DeBruce, supra:
"In Kuenzel [v. State], 577 So.2d [474] 504 [(Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.1991)], this Court held that `[t]he prosecutor's argument that "if surely we have the right to ask young people to defend this country and our way of life, then we have the right to execute the worst of its criminals" did not go beyond the bounds of legitimate argument.'"
DeBruce, 651 So.2d at 612. The appellant's argument did not amount to error.
The appellant last argues that the prosecutor misled jurors into ignoring evidence offered in mitigation. The state has the burden of proving that the aggravating circumstances outweigh the mitigating ones.
"This court in McWilliams v. State, 640 So.2d 982 (Ala.Cr.App.1991), aff'd in part, remanded on other grounds, 640 So.2d 1015 (Ala.1993), found that the prosecutor did not err when during his closing argument he went down the list of statutory mitigating circumstances and argued that none applied."
Burton, 651 So.2d at 657. The prosecutor's argument concerning the absence of mitigating circumstances was not error.

XXI
The appellant next argues that the trial court committed error in failing to instruct the jury that it should recommend a separate sentence for the appellant for each murder. The appellant was indicted under one count for the murders of Leon Billingsley and Linda Snipes during a robbery. The appellant was found guilty at the guilt phase of one count of capital murder. To make its verdict consistent with the indictment, the jury could only sentence the appellant to one sentenceโeither life in prison without parole or death by electrocution. The trial court committed no error in failing to instruct the jury to recommend two sentences for the appellant.
The appellant apparently contends that because the jury was not instructed that it could sentence the appellant separately for each death, it used the fact that two people were killed as a aggravating circumstance. We do not agree. The court went to great lengths to instruct the jury that only one aggravating circumstance was applicable to the case. No error occurred here.
The appellant lastly contends that the court in the penalty phase instructed the jurors that they had to refuse to consider uncontroverted mitigating evidence. The court charged the jury as follows:
"You must consider any evidence of a mitigating circumstance presented by the evidence at any time during any phase of the trial.
"A list of mitigating circumstances cannot and does not limit your deliberations, since you're free to consider any aspect... of Willie C. Dobyne's background and character as mitigation.
"Some circumstances are mitigating circumstances as a matter of law and must be considered by you.
"In addition, any other mitigating circumstance proven by a preponderance of *1350 the evidence could be used by any one or all of you as a mitigating circumstance in making your decision.
". . . .
"Also you may consider any other or additional mitigating circumstances that you find have been established by a preponderance of the evidence.
"A mitigating circumstance considered by you should be based on the evidence you have heard. When the factual existence of an offered mitigating circumstance is in dispute, the State shall have the burden of disproving the factual existence of that circumstance by a preponderance of the evidence. The burden of disproving it by a preponderance of the evidence means that you are to consider that the mitigating circumstance does exist, unless taking the evidence as a whole more likely than not that the mitigating circumstance does not exist. Therefore, if there's a factual dispute of the existence of the mitigating circumstance, you should not consider that mitigating circumstance unless you find the evidence is such that more likely than not that mitigating circumstance does not exist."
The court correctly told the jury that it could consider any evidence introduced, at either the guilt or penalty phase as evidence going to mitigation. Clisby v. State, 456 So.2d 99 (Ala.Cr.App.1983), cert. denied, 470 U.S. 1009, 105 S.Ct. 1372, 84 L.Ed.2d 391 (1985). See also งง 13A-5-51 and 13A-5-52, Code of Alabama 1975.

TRIAL COURT'S ORDER

XXII
The appellant next argues that the trial court's order sentencing him to death was "tainted" for several reasons. The court stated the following in its order:
"The State of Alabama has presented evidence of the existence of one of the aggravating circumstances set forth in Section 13A-5-49 of the Code of Alabama; that the capital offense was committed while the defendant was engaged or was an accomplice in the commission of robbery. As shown by his conviction for the capital offense, murder during robbery, the State has proven this aggravating circumstance beyond a reasonable doubt.
"The Court finds that the other aggravating circumstances set forth in Section 13A-5-49 do not exist in this case and the State has offered no evidence to prove their existence.
"The Court now considers the existence of mitigating circumstances.
"1) No evidence has been presented as to any criminal convictions by this Defendant. While current indictments are pending against him including another capital murder charge from an unrelated prior incident the Court cannot consider pending charges as criminal history. Cook v. State, 369 So.2d 1251 (Ala.1978). Accordingly the Court finds that the mitigating circumstance under Section 13A-5-51(1) exists.
"2) The Court finds that the mitigating circumstance under Section 13A-5-51(2) does not exist. While there was testimony of intoxication and possible mental retardation, the court considers that those factors should be considered under Section 13A-5-51(6) rather than this subsection. The Court recalls no credible evidence supporting this factor.
"3) The Court finds that the mitigating circumstance under Section 13A-5-51(3) does not exist.
"4) The Court finds that the mitigating circumstance under Section 13A-5-51(4) does not exist.
"5) The Court finds that the mitigating circumstance under Section 13A-5-51(5) does not exist.
"6) The court has considered the evidence presented in support of the mitigating circumstance under Section 13A-5-51(6). Psychiatric evidence presented during the sentencing phase showed Dobyne has an IQ of 73. This translates to a finding of borderline mental retardation. This is consistent with the findings of the examiners at Taylor Hardin Secure Medical Facility who conducted an outpatient forensic evaluation of the Defendant to determine his competency to stand trial and his mental state at the time of his offense. The evidence further indicated *1351 that Dobyne shows symptoms of fetal alcohol syndrome. The psychiatric evidence was summed up as showing that the Defendant was impulsive, a poor decision maker, limited in his capability to make moral decisions and borderline in intelligence. Again the Court concludes that these findings are consistent with the Taylor Hardin forensic report.
"Dobyne was determined to be competent to stand trial and competent at the time of the offense. There is no evidence that he suffers or has suffered from any mental illness. He does have a history of alcohol and crack cocaine abuse. This history continued through the date of the offense. There was also evidence of alcohol use at the time of the offense.
"Accordingly, while the Court does not find that the capacity of the Defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired, the Court does consider the evidence presented as a non-statutory mitigating factor.
"7) The Court finds that the mitigating circumstance under Section 13A-5-51(7) does exist.
"8) All non-statutory mitigating factors argued by the defendant are covered under the discussion in paragraph (6) above.
". . . .
"In consideration of all the circumstances it is the judgment of the Court that the aggravating circumstance outweighs the mitigating circumstances. It is therefore ORDERED, ADJUDGED and DECREED that as punishment for the offense of Capital Murder that the Defendant be sentenced to death."
The appellant first argues that the trial court erred in failing to find as a statutory mitigating circumstance that the appellant failed to appreciate or to be able to control his actions at the time of the offense. ง 13A-5-51(6), Code of Alabama 1975. Specifically, he contends that there was evidence that he had been drinking on the evening of the murders and that he suffered from fetal alcohol syndrome.
Section 13A-5-51(6), defines as a statutory mitigating circumstance:
"The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired...."
The court specifically found (see paragraph 6 of the trial court's order quoted above) that these facts presented a nonstatutory mitigating circumstance. The court based its ruling in part on the expert testimony of a defense witness, Dr. Lyman. The court's ruling concerning this issue is supported by the evidence presented at trial.
"The sentencing tribunal, and, on appeal, the reviewing court, determines the weight to be assigned to each factor. Ex parte Hart, 612 So.2d 536 (Ala.1992), cert. denied, Hart v. Alabama, 508 U.S. 953, 113 S.Ct. 2450, 124 L.Ed.2d 666 (1993); Smith v. State, 407 So.2d 894 (Fla.1981), cert. denied, 456 U.S. 984 (1982)."
Ex parte Giles, 632 So.2d 577, 585 (Ala.Cr. App.1993).
This court in Hadley v. State, 575 So.2d 145 (Ala.Cr.App.1990), specifically found that the trial court erred in failing to find as a statutory mitigating circumstance that the appellant failed to appreciate the criminality of his conduct when there was uncontroverted evidence presented at trial that the appellant's blood-alcohol level was .173 at the time of the murder.
Here, there was no testimony that at the time of the murder the appellant was so impaired that he failed to appreciate the criminality of his conduct. The court did find that the appellant's mental abilities presented a nonstatutory mitigating circumstance. The trial court committed no error here in not treating this as a statutory mitigating circumstance.
The appellant further contends that the court erred in considering the report compiled by the examining doctor at Taylor Hardin. Specifically, he contends that this violated his constitutional rights.
As the United States Supreme Court stated in Buchanan v. Kentucky, 483 U.S. 402, 422-23, 107 S.Ct. 2906, 2916-17, 97 L.Ed.2d 336 (1987):

*1352 "[I]f a defendant requests such an [psychiatric] evaluation or presents psychiatric evidence, then, at the very least, the prosecution may rebut this presentation with evidence from the reports of the examination that the defendant requested. The defendant would have no Fifth Amendment privilege against the introduction of this psychiatric testimony by the prosecution.
". . . .
"Here petitioner's counsel joined in a motion for Doctor Lange's examination.... Moreover, petitioner's entire defense strategy was to establish the `mental status' defense of extreme emotional disturbance.... In such circumstances, with petitioner not taking the stand, the Commonwealth could not respond to this defense unless it presented other psychological evidence."
Here, defense counsel, joined by the prosecutor, requested that the appellant be evaluated at Taylor Hardin. Although the appellant withdrew his insanity defense at the guilt phase, he relied on his mental health at the penalty phase to present a mitigating circumstance. The report prepared at Taylor Hardin was not introduced at the penalty phase. However, the prosecutor and defense counsel asked a question concerning the contents of the report. The court's order does mention the report; however, this did not amount to error.
The appellant further argues that it was error to consider the report because, he says, he was not represented by counsel at the interview at Taylor Hardin. As this court stated in McWilliams v. State, 640 So.2d 982, 990 (Ala.Cr.App.1991), aff'd in part, remanded on other grounds, 640 So.2d 1015 (Ala. 1993):
"[T]he introduction of the report did not violate the petitioner's Sixth Amendment right to the assistance of counsel, because defense counsel was on notice that he intended to put on a `mental status' defense for the petitioner and would therefore `have to anticipate the use of psychological evidence by the prosecution in rebuttal.'"
The appellant next contends that the court's order is flawed because, he says, it failed to state that the court considered all evidence presented for purposes of nonstatutory mitigating circumstances. We must agree.
"`It is not required that the evidence submitted by the accused as a non-statutory mitigating circumstance be weighed as a mitigating circumstance by the sentencer, in this case, the trial court; although consideration of all mitigating circumstances is required, the decision of whether a particular mitigating circumstance is proven and the weight to be given it rests with the sentencer.'"
McWilliams, 640 So.2d at 988, quoting, Haney v. State, 603 So.2d 368 (Ala.Cr.App.1991), aff'd 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993). (Citations omitted.) (Emphasis added.)
Because the trial court's order fails to state that it considered all evidence that presented nonstatutory mitigation we remand this case to the Circuit Court for Bibb County. Ex parte Cochran, 500 So.2d 1179 (Ala.1985). The court's order clearly shows that it considered all statutory mitigating evidence, however, it lists only certain nonstatutory circumstances it considered in mitigation. This cause is remanded so that the court can, if it has not previously, consider all other evidence offered towards nonstatutory mitigation and amend its order to reflect that it has "considered all evidence offered in mitigation." Due return should be filed in this court no later than 70 days from the date of this opinion.
REMANDED WITH DIRECTIONS.
All the Judges concur.
NOTES
[1] This rule supersedes ง 15-8-52, Code of Alabama 1975, which specifically provided for the consolidation of offenses in one count of an indictment if the offenses were of the same character and subject to the same punishment.
[2] This plea was later withdrawn before the case was submitted to the jury in the guilt phase.
[3] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[4] As stated previously, the appellant withdrew his plea of not guilty by reason of insanity prior to the case being submitted to the jury in the guilt phase. However, the appellant relied on the state of his mental health in mitigation in the penalty phase.
[5] For a discussion of evidence offered in mitigation at the penalty phase see Part XIII of this opinion.